**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

DONALD R. FOSHEE, CAROLYN           )
L. FOSHEE, MARILYN R. WILLIS,       )
SYLVIA J. YEWELL, MERVIN D.         )
YEWELL, LOIS L. YEWELL,             )
                                    )
    Plaintiffs,                     )
                                    )
v.                                  )           No. 09-2674-JPM-dkv
                                    )
FORETHOUGHT FEDERAL SAVINGS         )
BANK, FORETHOUGHT LIFE              )
INSURANCE COMPANY, and              )
COMMUNITY TRUST AND INVESTMENT      )
COMPANY,                            )
                                    )
    Defendants.                     )

**ORDER GRANTING RECEIVER MAX SHELTON'S MOTION TO STAY**

Before the Court is the Motion of Max Shelton, the duly-appointed Receiver of Forest Hill Funeral Home and Memorial-Park East, L.L.C. ("the Receiver"), to Dismiss or, in the Alternative, Stay Based on <u>Burford</u> Abstention (Docket Entry ("D.E.") 34), filed April 5, 2010.  Plaintiffs Donald R. Foshee, Carolyn L. Foshee, Marilyn R. Willis, Sylvia J. Yewell, Mervin D. Yewell, and Lois L. Yewell[1] ("Plaintiffs") responded in

---

[1]    On April 20, 2010 Plaintiffs filed a First Amendment to Class Action

1

opposition on June 16, 2010.[2]  (D.E. 49.)  With leave of Court, the Receiver filed a reply (D.E. 55) and supporting affidavit (D.E. 56) on July 9, 2010.  For the following reasons, the Court GRANTS the Receiver's motion to stay this case until the conclusion of the Receiver's state action.

I.  **BACKGROUND**

**A. Federal Complaint**

The Complaint in this case makes allegations based on a series of events related to the large-scale fraud perpetrated by Clayton Smart and others in 2005 on individuals who held pre-need funeral and burial services contracts with Forest Hill Cemeteries and Funeral Homes ("Forest Hill").  Plaintiffs assert that they purchased pre-need funeral and burial services contracts offered by Forest Hill and Tennessee Cemeteries, Inc. (collectively "the Funeral Homes").  Under the terms of these pre-need contracts, Plaintiffs pre-paid for funeral expenses in return for the Funeral Homes' promise to provide funeral and

---

Complaint, removing previously-named Plaintiffs Mervin D. Yewell and Lois I. Yewell because their deaths occurred prior to the filing of the Complaint. (D.E. 39 at 1.)

[2]    Included within the Receiver's motion to dismiss was a separate motion to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a) or, alternatively, by permission pursuant to Rule 24(b).  (See D.E. 34 at 6-7.)  On May 14, 2010, the Court granted the Receiver's motion to intervene as of right pursuant to Rule 24(a)(2).  (D.E. 46.)  After resolving this threshold matter, Plaintiffs were granted thirty days to respond in opposition to the Receiver's motion to dismiss.  (See D.E. 47.)

burial services or related merchandise at the time of the respective contract purchaser's death.

The State of Tennessee has in place a comprehensive statutory scheme for regulating cemetery companies and the sale of pre-paid funeral benefits contracts pursuant to the Tennessee Cemetery Act, Tennessee Code Annotated § 46-1-101 <u>et seq.</u>, and the Tennessee Prepaid Funeral Benefits Act, Tennessee Code Annotated § 62-5-401 <u>et seq.</u>  This statutory scheme provides for the establishment of certain trust fund accounts and bestows enforcement power upon the Commissioner of the Tennessee Department of Commerce and Insurance ("TDCI") to seek state court relief against cemetery companies and sellers of pre-need funeral contracts when they fail to establish and maintain these trust fund accounts.[3]

Specifically, the sale of pre-need funeral contracts and the establishment of trust fund accounts for these contracts are governed by the Tennessee Prepaid Funeral Benefits Act.  The

---

[3]     This is the second lawsuit filed by Plaintiffs against the named Defendants concerning the pre-need funeral trust funds established by Forest Hill.  This case, however, only names Forethought Federal Savings Bank, Forethought Life Insurance Company, and Community Trust and Investment Company as defendants, referring to Tennessee Cemeteries, Inc. and Forest Hill as "unnamed co-conspirators."  (Compl. ¶¶ 3-4.)  The underlying facts regarding the fraud and theft by Clayton Smart, Mark Singer, and others of pre-need funeral trust funds and the statutes and regulations governing pre-need funeral contracts are undisputed for the purpose of analyzing the Receiver's instant motion.  In the interest of judicial economy, the Court references some sections of a prior order issued in the consolidated action, <u>Parent v. Tennessee Cemeteries, Inc.</u>, case number 2:06-cv-02612, which outlines the regulatory framework governing pre-need funeral contracts in the State of Tennessee and the undisputed factual background of the ongoing state action.  (<u>See</u> Order Granting Receiver's Mot. for Stay of Proceedings, case no. 2:06-cv-02612, (D.E. 135).)

3

Prepaid Funeral Benefits Act requires a pre-need seller to register with the Commissioner of the TDCI.  Tenn. Code Ann. § 62-5-404(a).  After registering, a pre-need seller must have all pre-need funeral contracts approved by the Commissioner and comply with statutorily designated requirements.  See id. § 62-5-406.  Section 62-5-407 requires, inter alia, that

> [e]very pre-need seller engaged in the business of selling pre-need funeral contracts funded by a trust . . . establish a pre-need funeral trust fund . . . by executing a written trust agreement with a trustee . . . .
>
> ***   ***   ***   ***
>
> The pre-need seller, at the time of making the deposit, shall furnish to the trustee the name of each pre-need funeral contract beneficiary and the amount of payment on each for which the deposit is being made. . . .  The trust accounts shall be carried in the name of the pre-need seller, but accounting records shall be established and maintained for each individual pre-need contract beneficiary showing the amounts deposited and invested, and interest, dividends, increases, and accretions earned. . . .

See id. § 62-5-407(a)-(b).  Under the Prepaid Funeral Benefits Act, monies held in a pre-need funeral trust shall be held both as to principal and income earned on the principal, and shall remain intact, except to pay applicable taxes and reasonable expenses related to the administration of the trust.  See id. § 62-5-408.  Upon the death of the contract beneficiary, the trustee shall pay the pre-need seller only after sufficient proof has been provided that the terms of pre-need funeral

4

contract have been fully performed, and any remaining balance in the pre-need funeral trust fund shall be paid to the contract purchaser, the purchaser's estate, or otherwise named beneficiary.  See id. § 62-5-410(a)-(b).

Additionally, under the Cemetery Act, there are two types of trust fund accounts that a cemetery company is required to establish and maintain.  Tennessee Code Annotated § 46-1-204 requires a cemetery company to deposit twenty percent (20%) of the sales price it receives for each grave space and ten percent (10%) of the sales price for each mausoleum into an improvement care trust fund for each of its geographic locations.  The principal in this trust may not be invaded, and the corpus of the trust is supposed to remain whole.  The cemetery company may use the earnings on the corpus for the payment of trustee fees and other related items, such as taxes or tax preparation fees. These expenses are netted against the income received from the trust corpus, and the cemetery company may receive net income only.  The remaining net income is to be used for maintenance, repairs, upkeep, and beautification of the cemetery.

Tennessee Code Annotated § 46-1-207 also requires a cemetery company to maintain a pre-need merchandise and services trust fund for each of its locations.  When a cemetery enters into a pre-need contract for merchandise and services, the company is required to deposit into trust an amount equal to

one-hundred and twenty percent (120%) of the procurement cost of the merchandise.  Id.  A cemetery company may only receive funds from the merchandise and services trust fund upon certification that services or delivery of the merchandise specified in the sales contract have been completed.  Id. § 46-1-208.

Tennessee Code Annotated § 46-1-312(a) authorizes the Commissioner to petition the Chancery Court for the appointment of a receiver when a deficiency exists in a cemetery company's improvement care trust fund.  Tennessee Code Annotated § 46-1-312(d) provides that if it is impossible to correct the deficiency in the improvement care trust fund, the court may proceed to order the sale of the cemetery as provided in Tennessee Code Annotated § 46-1-309.  Under this section, the receiver is authorized to "take such action as the receiver deems necessary or appropriate to reform and revitalize the cemetery," including "all the powers of the owners, directors and operators, whose authority shall be suspended."  Id. § 46-1-312(e)(7).  In particular, the receiver is authorized to pursue "all appropriate legal remedies on behalf of the cemetery" if it appears that there has been criminal or tortious conduct, or breach of any contractual or fiduciary obligation.  Id. § 46-1-312(e)(7)-(8).  Tennessee Code Annotated § 46-1-309 also permits the Chancery Court to order seizure and sale of the cemetery

company's assets to the extent necessary to set up the improvement care trust fund.

Tennessee Code Annotated § 46-1-307(b) provides that the Commissioner may order the liquidation of any deficiency existing in a cemetery's merchandise and services trust fund. If the deficiency is not liquidated as ordered, the commissioner may bring an action in Chancery Court to recover the amount of the deficiency.  Id.  Upon finding that a deficiency exists, the court may appoint a receiver to operate the cemetery or, if necessary, order the seizure and sale of the assets of the cemetery company to make the trust whole.  Id.

In accordance with the statutory provisions in effect at the time, the Funeral Homes executed a written Trust Agreement establishing trust funds for the administration of pre-need funeral services contracts.  (See Order Den. Defs. Forethought Federal Savings Bank and Forethought Life Insurance Company's Mot. to Dismiss (D.E. 52) at 3.)  The Trust Agreement sets forth the Funeral Homes' desire to establish trust funds with a designated Trustee, in accordance with state law, to invest, manage, and disburse funds received as consideration for pre-need funeral services contracts.  (Id.)  On December 4, 1997, the Funeral Homes designated Defendant Forethought Federal Savings Bank ("FFSB") as Trustee of the various pre-need funeral services contract trust accounts.  (Id. at 5.)  Plaintiffs'

7

Complaint alleges that in or about 1998, Defendant FFSB "used portions of the trust money to purchase life insurance from its subsidiary, [Defendant] Forethought [Life Insurance Company], upon the lives of the pre-need contract holders." (Compl. (D.E. 1) ¶ 34.)  Plaintiffs allege that these purchases along with the payment of sales commissions for these purchases were made without the consent or knowledge of the pre-need contract holders. (Id. ¶¶ 35-36.)  According to Plaintiffs, these actions "depleted the trust monies." (Id. ¶ 34.)

On December 7, 2004, the Funeral Homes substituted Defendant Community Trust and Investment Company ("Community Trust") as the Trustee for the pre-need funeral contract trust accounts. (D.E. 52 at 5.)  Plaintiffs allege that thereafter Defendant Community Trust caused and Defendant Forethought Life Insurance Company ("FLIC") allowed the life insurance policies to be cash surrendered and imposed substantial surrender charges further depleting the trust monies. (Compl. ¶¶ 39-40.) Plaintiffs claim that Defendant Community Trust then "allowed the trust monies to be withdrawn by one or more individuals, unnamed co-conspirators who stole or otherwise absconded with the trust monies to the detriment of the Plaintiffs and members of the class." (Id. ¶ 41.)

According to a Verified Complaint filed by the State of Tennessee in a factually-similar action involving different

parties, there was approximately $29.5 million in assets held in trust, which included life insurance policies with a face value of $22 million at the time Defendant FFSB was replaced as Trustee by Defendant Community Trust. (See Order Den. Defs. FFSB and FLIC's Mot. to Dismiss (D.E. 52) at 6.)  The cash surrender of 13,465 life insurance policies resulted in a loss of $9,547,082.00 in trust assets.  (Id.)

As a result of these alleged acts, Plaintiffs' federal Complaint asserts eight state law causes of action against Defendants: (1) breach of fiduciary duty, (2) negligence or wantoness, (3) conversion, (4) concealment or fraud by suppression, (5) civil conspiracy, (6) unjust enrichment, (7) money had and received, and (8) violations of the Tennessee Consumer Protection Act, Tennessee Code Annotated § 47-18-101 et seq.  (Compl. ¶¶ 21, 43-76.)  Because of these alleged wrongs, Plaintiffs claim that there are insufficient trust monies to provide for the funeral and burial services and merchandise as contracted for by Plaintiffs and that the depletion of trust assets has caused a loss of earnings that could have appreciated.

**B. The State Complaint**

In October 2005 and in accordance with the statutory scheme governing the sale of pre-need funeral contracts and cemetery companies, the TDCI began a routine audit of Forest Hill's trust

assets.  Investigators found that Forest Hill had lost a
significant amount of its assets through risky investments, and
in July 2006, Forest Hill announced that it could no longer
afford to honor the policies it had sold.  (See Order Granting
Receiver's Mot. to Stay, Foshee v. Tenn. Cemeteries, Inc., et
al., Case No. 2:06-cv-02619 ("Foshee") consolidated with, Parent
v. Tenn. Cemeteries, Inc., Case No. 2:06-cv-02612 ("Parent"),
(D.E. 135) at 3.)  In August 2006, the TDCI issued a report
detailing the financial mismanagement at Forest Hill, and in
December 2006, the TDCI issued an order of conditional
suspension of Forest Hill's operations.  (Id. at 3-4.)

On January 8, 2007, the State of Tennessee ex rel. William
L. Gibbons, District Attorney General for the 30th Judicial
District, and Paula A. Flowers, Commissioner of the TDCI, filed
an action in the Chancery Court of Shelby County, Tennessee,
styled State of Tennessee ex rel. Gibbons, et al. vs. Clayton
Smart, et al., Case No. CH-07-0050-2, against defendants Forest
Hill, Clayton Smart, Stephen Smith, Indian Nation, LLC, and
Redbud Tree Investments, LLC, under the Tennessee General
Cemetery Act of 1968 and the Tennessee Cemetery Merchandise and
Services Act of 1979.  (D.E. 26, Ex. 6 at 45.)  The plaintiffs
in the state action asked the Chancery Court to appoint a
receiver for Forest Hill claiming that its statutory trust funds
had been misappropriated and depleted by approximately

10

$20,000,000.00.  On February 2, 2007, the Chancery Court entered
an order establishing a receivership for Forest Hill for the
primary purpose of tracing, recovering, and marshaling Forest
Hill's trust funds.  (D.E. 26, Ex. 1 - Chancery Ct. Order, *inter
alia*, Granting Mot. for Appointment of Receiver for Trust Funds
of Forest Hill.)

On April 4, 2007, the Chancery Court appointed Max Shelton
as the Receiver for Forest Hill and its related entities.  (D.E.
26, Ex. 2 – Order Confirming Appointment of Receiver and
Granting Injunctive Relief ("April 4, 2007 Chancery Court
Order").)  The order authorized the Receiver to "take charge of,
control, and manage" Forest Hill "for the purpose of bringing
Forest Hill and its Related Entities into compliance with
Tennessee law, namely the Cemetery Act, as amended, codified at
Tenn. Code Ann. §§ 46-1-101, et. seq." (Id. at 1-2.)  The
Chancery Court authorized the Receiver to trace, recover, and
marshal Forest Hill's trust funds from various sources, granting
the Receiver the broad power to "take any and all actions
reasonably necessary to protect and maximize the assets of
Forest Hill." (Id. at 2-3.)

In pertinent part, the April 4, 2007 Chancery Court Order
directed the Receiver

>       to take *exclusive* custody, control and possession of
>       all . . . causes of action, credits, monies,
>       investments,  stocks,  shares,  effects,  books  and

> records of account, other papers and property, and all
> interests, whether real or personal, tangible or
> intangible, of whatever type, kind or nature owned or
> held by the Receivership entity, with full power to
> sue for, collect, receive and take possession of such
> properties and assets, wherever located, and to
> conserve and administer them *under the general
> supervision of the [Chancery] Court.*

(Id. at 2 (emphasis added).)  The Chancery Court's order further

stated

> [t]hat there shall be no complaint, counter-complaint
> or similar action initiated or continued against the
> Receivership entity, the property of the receivership,
> the Receiver in his official or individual capacity
> for any of his actions as receiver . . . in connection
> with this receivership *otherwise than by appearing in
> this cause and with the permission of this Court.*

(Id. at 5 (emphasis added).)

On April 10, 2007, the Chancery Court ordered the Receiver

to move to intervene in the then-pending and consolidated

federal actions Foshee and Parent to seek a stay of the

litigation to allow the Receiver to perform his duties.  (D.E.

26, Ex. 10 – Chancery Ct. Order Directing Receiver to Move to

Intervene in Pending Lawsuits.)  According to the Chancery

Court, "the interests of comity and the administration of

justice would be best served if the Federal Actions were stayed

in order to permit the Receiver to perform his charge."  (Id. at

2.)

Pursuant to the April 10, 2007 order, the Receiver filed a

Motion for Stay of Proceedings.  (D.E. 102, Case No. 2:06-cv-

02612.)  Upon reference, the Magistrate Judge entered an Order
Granting Receiver's Motion for Stay of Proceedings based on
<u>Burford</u> abstention, staying the federal actions until the
conclusion of the Receiver's state action.  (<u>See</u> Order Granting
Receiver's Mot. for Stay of Proceedings (D.E. 135), Case No.
2:06-cv-02612; <u>see also</u> D.E. 26, Ex. 12 – Order Granting
Receiver's Mot. for Stay of Proceedings.)  On August 20, 2009,
the Court granted in part Defendants FFSB, FLIC, and Community
Trust's Motion to Dismiss as to all plaintiffs other than Donald
R. Foshee and Carolyn L. Foshee.  (<u>See</u> D.E. 157, Case No. 2:06-
cv-02612.)  The claims of the plaintiffs other than the Foshees
were dismissed with prejudice because those plaintiffs had
signed a settlement agreement with the Receiver releasing any
and all claims related to or pending against Forest Hill. (<u>See</u>
<u>id.</u>)

**C. The Receiver's Actions Pursuant to Chancery Court Orders**

Upon receiving his appointment by the Chancery Court, the
Receiver has actively traced, marshaled, and recovered trust
funds belonging to Forest Hill.  On March 23, 2007, upon the
Receiver's motion, the Chancery Court entered an Order Directing
First Hope Bank, N.A. to Make Payment of Trust Funds into
Registry of the Court, which resulted in the recovery of
$1,759,358.80. (Decl. of Max Shelton (D.E. 26) ¶ 3; Decl. of Max

Shelton, Case No. 2:06-cv-02612 (D.E. 118-1) ¶ 5.)[4]   On that same date, the Chancery Court entered an Order Directing Citigroup Global Markets, Inc. d/b/a Smith Barney to Make Payments of Trust Funds into Registry of the Court, which resulted in the recovery of $5,926,795.12.[5] (Decl. of Max Shelton (D.E. 26) ¶ 3; Decl. of Max Shelton, Case No. 2:06-cv-02612 (D.E. 118-1) ¶ 5.)

On May 2, 2007, the Chancery Court granted a petition filed on April 10, 2007 by the Receiver and the state for an order allowing certain Forest Hill trust funds previously invested in life insurance policies with a face value of $1,634,051.95 to remain in the possession of FFSB, as trustee.[6] (D.E. 26 Ex. 5 – Order Allowing Trust Funds to Remain in Possession of Trustee, Forethought Federal Savings Bank; Decl. of Max Shelton, Case No. 2:06-cv-02612 (D.E. 118-1) ¶ 8.) On May 10, 2007, the Chancery Court entered a Temporary Injunction Order enjoining Matthew

---

[4]    The Court notes that the Receiver Max Shelton has filed several declarations and supplemental declarations documenting the Receivership's efforts to trace, marshal, and recover Forest Hill's trust assets both in the present lawsuit and the previously filed lawsuit.  The declarations and supplemental declarations cited to from Parent are attached as copies to Docket Entry 26 as Exhibits 5-9 and incorporated by reference as if set forth in full to the Receiver's most recent declarations.  (See Decl. of Max Shelton (D.E. 26) ¶ 4.)

[5]    According to the Receiver, those funds have been invested in the Topiary Fund, a hedge fund managed by Citigroup Global Markets, Inc. d/b/a Smith Barney.  (Decl. of Max Shelton, Case No. 2:06-cv-02612 (D.E. 118-1) ¶ 5.)

[6]    The Chancery Court found that allowing FFSB to continue to act as trustee over such policies, as opposed to liquidating those policies at the cash surrender value, was in the best interest of the pre-need contract purchasers. (See D.E. 26, Ex. 5 – Order Allowing Trust Funds to Remain in Possession of Trustee, Forethought Federal Savings Bank at 2-3.)

Heisey, MDH V, LLC, and Mark Singer from transferring, concealing, destroying, or making any other disposition of any personal or corporate assets, including, but not limited to funds in banks or brokerage accounts, automobiles, or any other real or personal property owned, possessed or controlled by any of them without prior authorization from the Chancery Court. (D.E. 26 Ex. 5- Decl. of Max Shelton ¶ 10).  Pursuant to that order, the sum of $1,305,496.67 that previously was held in a MDH V, LLC account at Citigroup Global Markets, Inc. was paid over to the Registry of the Chancery Court. (Id.).

On May 14, 2007, the Chancery Court entered a Temporary Injunction Order as to Mark Singer on the application of the Receiver, enjoining Mark Singer and all persons acting in concert with him from transferring, concealing, or destroying any personal or corporate assets without prior authorization from the Chancery Court.  (Id. ¶ 11.)  On May 28, 2007, after the Forest Hill bankruptcy proceedings were dismissed, the Chancery Court entered an Amended Order Restraining Forest Hill Funeral Home and Memorial Park – East, LLC and Setting Hearing on Motion for Temporary Injunction and Appointment of Receiver. (D.E. 26 Ex. 7 – Second Supplemental Decl. of Max Shelton, Case No. 2:06-cv-02612, ¶ 9.)

On May 31, 2007, a Temporary Injunction Order was entered in the Receiver's action enjoining the defendants and persons

acting in concert with them from transferring or otherwise disposing of any of the assets that they received from the trust funds of Forest Hill. (D.E. 26, Ex. 6 - Supplemental Decl. of Max Shelton, Case No. 2:06-cv-02612 ¶ 4.)  The Temporary Injunction Order directed the transfer of $520,527.31 held in certain accounts of defendant Kimberly Singer at Citigroup Global Markets, Inc. d/b/a Smith Barney into the Registry of the Chancery Court. (Id.)  The Receiver also obtained an order which required Greenlight Capital, LP to pay $5,266,811.71 into the Chancery Court's Registry.  (Id. ¶ 5.)

The Receiver initiated contempt proceedings against defendants Clayton Smart, Stephen Smith, Indian Nation, LLC and Redbud Tree Investments, LLC for failure to comply with the Chancery Court's February 2, 2007 order, which directed those defendants to submit personal and corporate financial information to the Receiver.  (Id. ¶ 6.)  The Receiver then filed Motions for Partial Default Judgment as to defendants Trailer World of America, LLC d/b/a Horsemen Interiors, Quest Mineral and Exploration, Inc., Tennessee Granite and Bronze, LLC, Fine Line Tuning, LLC, Clayton Smart, and MDH V, LLC.  (Id. ¶ 8).

While these actions were occurring, the Receiver filed a First Amended Verified Complaint to Recover Trust Funds and for Injunctive Relief on May 7, 2007 in Chancery Court.  This

ancillary state action filed by the Receiver named twenty-one
defendants for fraudulent transfer, conspiracy to defraud,
conversion, and breach of fiduciary duty, and was amended on May
31, 2007 to include additional defendants, but not FFSB or FLIC.
(Id. ¶ 9).  According to the Receiver's most recent declaration,
the "Receivership has actively investigated potential claims
against FFSB and FLIC and entered into an agreement with FFSB
tolling the statute of limitations until [October 1, 2010]."
(Decl. of Max Shelton (D.E. 26) ¶ 10; First Supplemental Decl.
of Max Shelton (D.E. 56) ¶ 2.)  A tolling agreement between FFSB
and the Receivership has been in effect continuously since May
2, 2007.  (First Supplemental Decl. of Max Shelton (D.E. 56) ¶
2.)

     Since the initiation of the state court proceedings, the
Receivership, under the supervision of the Chancery Court,
continues to pursue legal action to recover trust assets.  The
Receivership has been honoring all Forest Hill pre-need
contracts, such as those at issue in this case, since April 2007
(Decl. of Max Shelton (D.E. 26) ¶ 6), and the Receivership has
developed a claim reimbursement procedure that has allowed it to
settle the claims of all pre-need contract holders who paid an
amount to Forest Hill in excess of the amount of his or her
original pre-need contract (id. ¶ 7; see also D.E. 26, Ex. 7 –
Chancery Ct. Order Establishing Claim Procedure).  On February

17

22, 2010, the Chancery Court granted the Receiver's Motion for Summary Judgment on the issue of liability as to defendants Clayton Smart, Mark Singer, Nancy Smart, and Christopher Smart. (Decl. of Max Shelton (D.E. 26) ¶ 3.)  The motion for summary judgment as to Kimberly Singer was continued and is to be reset for a later date, and the Chancery Court has ordered that the parties set a Writ of Inquiry to determine the precise amount of damages to be awarded to the Receivership from each defendant. (Id.)

Plaintiffs have never moved the Chancery Court for permission to pursue their state law claims related to their pre-need funeral contracts with Forest Hill against Defendants in this action.  (First Supplemental Decl. of Max Shelton (D.E. 56) ¶ 5.)  At this time, Plaintiffs have not made any demand upon Forest Hill for services or merchandise that has not been met.  Plaintiffs' claims in this instant action are based on the harm they have suffered as a result of the depletion of the assets in the pre-need trust funds and the loss of earnings that could have appreciated on such funds.

## D. The Receiver's Motion to Dismiss or, in the Alternative to Stay

On April 5, 2010, the Receiver filed the present motion for dismissal or, in the alternative, to stay the federal action until such time that the Receiver's state action, State of

<u>Tennessee ex rel. Gibbons v. Clayton Smart, et al.</u>, Chancery
Court of Tennessee for the Thirtieth Judicial District at
Memphis, Case No. CH-07-0050-2 (consolidated), is resolved. In
support of his motion, the Receiver relies on the abstention
principles first established in <u>Burford v. Sun Oil Co.</u>, 319 U.S.
315 (1943).

Pursuant to these principles, the Receiver contends that
(1) the State of Tennessee has a comprehensive statutory scheme
for regulating cemetery companies and pre-need funeral
contracts, (2) this highly regulated state process involves a
subject matter of substantial public concern, (3) the regulatory
system and Receivership that has been established by the state
court is designed to centralize the decision-making process, and
(4) "allowing the instant action to proceed against FFSB and
FLIC could subvert and frustrate the Chancery Court's orders
directing the Receivership to trace, marshal, and recover the
trust assets of the Forest Hill estate." (Decl. of Max Shelton
(D.E. 26) ¶ 11.) The Receiver claims that dismissing, or at
least staying, the federal action would eliminate the potential
for conflicting claims to trust funds, and permit the Chancery
Court, which is deeply immersed in the facts and complex
regulatory scheme governing funeral homes, to have exclusive
jurisdiction over claims to trust funds, promoting comity and
judicial economy.

Plaintiffs contend that the Receiver has failed to pursue claims against the named Defendants in the instant action. Plaintiffs argue that allowing their federal action to continue will not interfere or conflict with the work of the Receivership since no claims have been asserted against the named Defendants.

## II.  **ANALYSIS**

### A. Overview of Burford Abstention Doctrine

Federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress; this duty, however, is not absolute.  See, e.g., Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996).[7]  Simply because a federal court may have subject matter jurisdiction does not mean that it must be exercised in every instance.  In certain limited instances, "federal courts may decline to exercise their jurisdiction . . . where denying a federal forum would clearly serve important countervailing interests."  Adrian Energy Assocs. v. Mich. Pub. Serv. Comm'n, 481 F.3d 414, 421 (6th Cir. 2007) (quoting Quackenbush, 517 U.S. at 716); see also Quackenbush, 517 U.S. at 723 ("Federal courts abstain out of deference to the paramount interests of another sovereign, and the concern is with principles of comity and federalism."); Erwin Chemerinsky, Federal Jurisdiction 784-85 (5th ed. 2007)

---

[7]    Based on the Court's Order Denying Defendants FFSB and FLIC's Motion to Dismiss (D.E. 52), the Court acknowledges that it has subject matter jurisdiction to adjudicate Plaintiffs' diversity claims.  (D.E. 52.)

("Abstention doctrines uniformly reflect a desire to allow state courts to decide certain matters instead of federal courts . . . . [A]bstention is defined as promoting federalism and harmony between federal and state courts.").

Abstention from hearing the merits of a case is not one doctrine but several. Adrian Energy Assocs., 481 F.3d at 423. The Receiver poses the single argument that the Court should decline to decide the merits of the questions presented in Plaintiffs' lawsuit under the abstention doctrine first articulated in Burford v. Sun Oil Co., 319 U.S. 315 (1943). This doctrine provides that "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 361 (1989) (citation omitted).

Because Burford abstention is concerned with the potential disruption of a state administrative scheme, rather than the

mere existence of such a scheme, courts must look behind the action to determine whether it implicates the concerns raised in Burford.  Adrian Energy Assocs., 481 F.3d at 423-24. "Ultimately, what is at stake is a federal court's decision, based on careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the independence of state action, that the state's interests are paramount and that a dispute would best be adjudicated in a statue forum."  Quackenbush, 517 U.S. at 728 (citations and internal quotation marks omitted).[8]

  "This equitable decision balances the strong federal interest in having certain classes of cases, and certain federal rights adjudicated in federal court, against the State's interests in maintaining uniformity in the treatment of an essentially local problem, and retaining local control over difficult questions of state law bearing on public problems of substantial public import."  Id. (citations and internal quotation marks omitted).  Although the Supreme Court has located the power to abstain in the historic discretion exercised by federal courts "sitting in equity," it has not treated abstention as a "technical rule of equity procedure." See id. at 718.  The Supreme Court recognized, instead, that the

---

[8] See also New Orleans Pub. Serv., Inc., 491 U.S. at 363 (noting that the question under Burford is whether adjudication in federal court would "unduly intrude into the process of state government or undermine the State's ability to maintain desired uniformity.").

authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief.  Id.

**B. Abstention Analysis**

In the instant case, the Court finds that a stay until the conclusion of the ongoing state action is warranted under Burford.  First, Plaintiffs' complaint alleges only state law claims.  (See Compl. ¶ 21 ("No claim is brought pursuant to any Federal law").)  No federal interests have been articulated.  In contrast, Tennessee has a pronounced interest in this case. "The rights of burial are public rights uniquely reserved to the states to protect the life, health, comfort, and well-being of the community."  Gray v. Bush, No. 1:08-cv-631, 2009 WL 2567189, at *7 (W.D. Mich. Aug. 17, 2009) (citations omitted)[9]; see also (Order Granting Receiver's Mot. for Stay of Proceedings, Case No. 2:06-cv-02612 (D.E. 135) at 30 (finding that the State of Tennessee's statutory scheme for regulating cemetery companies and pre-need funeral contracts is a "highly regulated state process and a "matter of substantial public concern").)

Next, as described *supra* in Section I(a) and noted by the Court previously in Parent, the State of Tennessee has

---

[9]     Gray is a factually related case regarding the misappropriation of cemetery trust monies involving several of the same defendants named in the ongoing Tennessee state court action.  Gray, 2009 WL 2567189, at *1-*4.  The court in Gray granted the defendant's motion for abstention and dismissed the federal complaint.  Id. at *8.

constructed a comprehensive statutory scheme for regulating cemetery companies and pre-need funeral contracts.  See Tenn. Code Ann. § 46-1-101 et seq.; Tenn. Code Ann. § 62-5-401 et seq. The importance of outlining this statutory scheme is not merely to highlight its existence, but to demonstrate how the adjudication of Plaintiffs' claims by this Court risks disrupting the procedures designed to create a centralized decision-making and enforcement process for a local matter of public importance.

There is no dispute that the depletion of the trust assets for which Plaintiffs are seeking relief has been and continues to be thoroughly examined by the Chancery Court.  Following the filing of the Verified Complaint, the Chancery Court established a receivership for Forest Hill and appointed Max Shelton as its receiver.  (D.E. 26, Exs. 1 & 2.)  In taking this action, the Chancery Court instructed the Receiver to "take charge of, control, and manage" Forest Hill "for the purpose of bringing Forest Hill and its Related Entities into compliance with Tennessee law, namely the Cemetery Act, as amended, codified at Tenn. Code Ann. §§ 46-1-101, et. seq." (D.E. 26, Ex. 2 – April 4, 2007 Chancery Ct. Order.)  The Receiver was granted the broad power to "take *any and all actions* reasonably necessary to protect and maximize the assets of Forest Hill." (Id. at 2-3 (emphasis added).)

More specifically, the Chancery Court's April 4, 2007 Order directed the Receiver to take "exclusive custody, control and possession of all . . . causes of action, . . . and all interests . . . owned or held by the Receivership entity." (Id. at 2.)  To ensure that the litigation in this matter remained centralized, the Chancery Court stated "[t]hat there shall be no complaint, counter-complaint or similar action initiated or continued against the . . . property of the receivership . . . otherwise than by appearing in this cause and with the permission of this Court." (Id. at 5.)  Shortly following the Chancery Court's April 4, 2007 Order, the Chancery Court directed the Receiver to intervene in the then-pending and consolidated Foshee and Parent actions to seek a stay of the litigation to allow the Receiver to perform his duties.  (D.E. 26 Ex. 10 – Chancery Ct. Order Directing Receiver to Move to Intervene in Pending Lawsuits.)  According to the Chancery Court, "the interests of comity and the administration of justice would be best served if the Federal Actions were stayed in order to permit the Receiver to perform his charge." (Id. at 2.)  As noted, the Receiver's motion was granted by this Court on August 20, 2007.  (Order Granting Receiver's Mot. for Stay of Proceedings, Parent, Case No. 2:06-cv-02612-Ml/P (D.E. 135).)

Since the April 4, 2007 Chancery Court Order, the record demonstrates that the Receiver has invoked the power of the

Chancery Court to adjudicate violations of the statutory scheme
in accordance with the centralized framework established by the
Chancery Court.  From 2007 to the present, the Receiver's
actions have been and continue to be monitored by the Chancery
Court.  At no time have the Plaintiffs filed a complaint in the
Chancery Court asserting their state law causes of action which
seek relief in the form of compensation for the same depleted
trust assets that the Receiver has been ordered to trace,
marshal, and recover.

Allowing Plaintiffs to proceed with their federal action
would permit Plaintiffs to circumvent the Chancery Court's order
prohibiting similar actions against the property of the
Receivership without first appearing before the Chancery Court
to seek permission to do so.  The Chancery Court expressly
granted the Receiver the exclusive power to take custody of the
property owned or held by the Receivership and to sue for such
properties and assets wherever located.  This power centralizes
and facilitates this factually complex case involving a heavily
regulated state business.  Permitting Plaintiffs to litigate
this action in federal court before the conclusion of the state
court proceedings risks undermining this centralized process and
may result in conflicting claims to the depleted trust assets
currently in dispute.

Additionally, the Receiver has stated that Defendant FFSB "is actively assisting the Receivership" in its efforts to recover trust funds, and that the "Receivership has preserved any possible claims of Forest Hill against [Defendant FFSB] through a tolling agreement." (Receiver's Mem. in Supp. of Mot. to Dismiss (D.E. 34-1) at 8.)  On July 9, 2010, the Receiver submitted a first supplemental declaration, which stated that on May 3, 2010, FFSB and the Receiver "executed a Third Amendment to Tolling Agreement," which extended the previous tolling agreement with Defendant FFSB "for an additional period up to and including October 1, 2010." (First Supplemental Decl. by Max Shelton (D.E. 56) ¶ 2.)

The Receiver also has tolling agreements in place with other entities believed responsible for the misappropriation of the Forest Hill trust funds. (Id. at ¶ 3.)  Permitting a federal action to proceed against the named Defendants jeopardizes these tolling agreements and may jeopardize the ability of the Receiver to negotiate similar agreements in the future.  In light of these facts, and in the interests of comity and federalism, the Court finds that the state's interests in the centralized adjudication of the facts underlying this case outweigh the Court's interest in adjudicating the merits of Plaintiffs' federal action at this time.

**C. Disposition**

27

Having determined not to entertain the merits of Plaintiffs' claims, the remaining question is whether this Court should dismiss Plaintiffs' action requesting both monetary and equitable relief, or enter a stay merely postponing adjudication. After locating the power to abstain in the historic discretion exercised by federal courts "sitting in equity," the Supreme Court in Quackenbush held that "a federal court cannot, under Burford, dismiss or remand an action when the relief sought is not discretionary." Quackenbush, 517 U.S. at 731. The Court noted that in cases applying traditional abstention principles to damages actions it has only been permissible to "withhold action until the state proceedings have concluded." Id. at 730.

In accordance with these principles, the Sixth Circuit has instructed that "even when abstention is appropriate, a district court should stay, not dismiss, the federal suit." Habich v. City of Dearborn, 331 F.3d 524, 534 n.4 (6th Cir. 2003) (citing Brindley v. McCullen, 61 F.3d 507, 509 (6th Cir. 1995); see also Quackenbush, 517 U.S. at 730-31 (noting that "Burford might support a federal court's decision to postpone adjudication of a damages action pending the resolution by the state courts of a disputed question of state law."). A stay "avoids the costs of refiling, allows the plaintiffs to retain their place on the court docket, and avoids placing plaintiffs in a sometimes

28

difficult position of refiling their case before the statute of limitations expires." Adrian Energy Assocs., 481 F.3d at 424-425.

Although staying a lawsuit instead of dismissing it "will often reflect an abundance of caution, . . . it protects the plaintiff whose federal claims were not resolved on the merits in state court." Id. at 425.  Even though Plaintiffs do not assert any federal claims, they have asserted claims requesting both legal and equitable remedies.  Based on the benefits articulated in Adrian Energy Associates, see 481 F.3d at 424-25, and because Plaintiffs' Complaint requests both legal and equitable relief, the Court finds that staying Plaintiffs' lawsuit rather than dismissing it is the more appropriate course.  If at the conclusion of the state court proceedings, Plaintiffs contend that their claims against Defendants have not been addressed by the Receiver's actions, access to this Court is not foreclosed.

## III. <u>CONCLUSION</u>

For the foregoing reasons, the Receiver's Motion to Stay is GRANTED.  Plaintiffs' action shall be STAYED until the conclusion of the Receiver's state action.

SO ORDERED this 15th day of August, 2010.

/s/ JON PHIPPS McCALLA
CHIEF UNITED STATES DISTRICT JUDGE